IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

Criminal Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                           ) | Criminal No. 07-CR- 115 |
| ) | |
| ) | |
| LISA WALL                            ) | |
| _____ | |

**DEFENDANT'S SENTENCING MEMORANDUM**

On July 12, 2007, defendant Lisa Wall pled guilty to one count of Theft From a Program Receiving Federal Funds, in violation of 18 U.S.C. §666. She is scheduled to appear before this Court for sentencing on October 30, 2007. In this memorandum the defendant seeks to briefly address the issues she believes relevant to a sentencing determination.

**I. Introduction**

The parties have stipulated in the written plea agreement – there being no adjustments or departures in dispute – that the total adjusted offense level is 8. As the author of the Pre-sentence Report ("PSR") has taken no issue with the calculus underlying that stipulation, and as there is full agreement that the applicable Criminal History Category is I and the resulting Guideline range for imprisonment thus 0 - 6 months, Ms. Wall briefly addresses herein the points she believes relevant in support of the probationary sentence she now respectfully moves this Court to impose.

**II. Offense Conduct**

In her plea agreement and at the time of her plea, Ms. Wall admitted that from approximately March, 2004 to March 2005, while employed at the Washington Area Transit Authority ("WMATA"), she used her position to falsify tuition reimbursement forms, resulting in the issuance

of nine checks amounting to $15,000 which were converted to her own use.

**III. The Defendant's Immediate and Ongoing Acceptance of Responsibility Once Confronted**

Seven of the nine fraudulently obtained checks were issued in 2004 and the remaining two in early 2005. It was not until June 14, 2006, however, almost fifteen months after converting the last of the nine checks, that Ms. Wall was confronted by Metro Transit Police Detectives. Then and there she waived her rights to remain silent and to the assistance of counsel and admitted her crime in full detail. Her statement resulted in termination just days thereafter.

After retaining counsel and in turn agreeing to a de-briefing by Assistant United States Attorney Tony Alexis, Ms. Wall was asked by representatives of WMATA if she would also agree to meet with them to help them better understand – and thus shore up – the internal procedural weaknesses that made her crime possible. Ms. Wall readily agreed to WMATA's request and thus was questioned yet a third time about her criminal conduct. was in effect debriefed a third time. She did not agree to the meeting with WMATA with an expectation of credit with, or benefit from, the government, but instead because she was hopeful that those important to her – her family, children and co-workers alike – would see that her fraudulent conduct did not entirely define her character.

**IV. The Circumstances That Preceded and Then Attended the Defendant's Fraud**

As the court will note from the PSR, Ms. Wall was employed by Howard University ("Howard") for 14 years - since the age of 21 - before taking a job with WMATA in March, 2003. Her employment at Howard began shortly after she received her Associates Degree in Information Systems from Jefferson Business College. Ms. Wall had been very happy at Howard and as the years passed, actually had it in her mind that she would retire there.

However, in August 2000, after twelve years at Howard, Ms. Wall met Greg Smallwood. A relationship developed quickly and later that same year Smallwood convinced Ms. Wall that the

smart play would be to purchase a house together. Although skeptical and believing that things were moving too fast, Ms. Wall nevertheless agreed. She gave Smallwood $5,000 for her share of the down payment, $1,600 of it that having been earmarked for the rent that was soon coming due at her apartment. Before that rent became due, she gave her landlord a sixty-day notice. Her rent for the last two months was very late due to the funds committed to the down payment, so when Smallwood told her a week before the scheduled closing that the lender had backed away due to issues with his credit report (it would be later revealed that Smallwood's wife found out about the deal and threatened to include the house in divorce litigation already underway), Ms. Wall's landlord was disinclined to let her have her apartment back. She was told the apartment had already been let. Smallwood returned $2,500 of the $5,000 to Ms. Wall, claiming that the bank would return the rest in due course. She would never see the remaining $2,500.

Ms. Wall quickly tried to rent another apartment nearby her old place, but the prospective landlord asked for references and did not take well to Ms. Wall's payment record for the preceding three months. With time short (her then-landlord eventually was convinced to give her an additional 15 days to vacate), Mr. Smallwood rented a place for the defendant and her three children. He in turn moved in three months later. For the two years that followed, the relationship proved first disappointing, then disheartening. Soon after moving in, Smallwood revealed a want to control the defendant's life, in particular where she went and with whom she spent time when she wasn't with him. Ms. Wall's family did not take well to Smallwood, and eventually stopped coming around. Smallwood himself didn't seem to have friends or family.

When Smallwood learned that Ms. Wall once had a relationship with an individual who still worked at Howard, Smallwood set upon a campaign to have Ms. Wall find another place to work. He was relentless and Ms. Wall eventually applied for a position with Smallwood's employer,

WMATA, a position similar to the one she held at Howard. WMATA soon made Ms. Wall an offer which she accepted in March, 2003.

When Ms. Wall learned by chance shortly thereafter that Smallwood was not in fact divorced as he had claimed, she found an apartment with a less discerning landlord and moved. Four months later, Smallwood showed her papers that appeared to be final divorce papers and Ms. Wall agreed to move back with him. Her decision was more a practical one, made for the good of her children: she had not realized when she hurriedly moved out just how dangerous a neighborhood she had moved to.

Wall and Smallwood would remain together for one more year thereafter and it was during that year – from November, 2003 to November, 2004 – that Ms. Wall arranged for the issuance of seven of the nine converted checks. In early 2004, within just a few months of returning to live with Smallwood, Wall returned from work to find a notice to quit posted on the front door. Upon inquiry, she learned that Smallwood was approximately $3,500 in arrears on his rent. Ms. Wall was shocked; as had been their arrangement all along, she had been paying Smallwood one-half of the rent and utilities every month, in addition to attending to almost all the needs of her three children as well.

It seems that Smallwood's spotty record of appearance as a train operator at WMATA for the three years prior – a record he claimed was due to a long-standing injury suffered on the job – was by now costing him even when he was inclined to, or was able to, work. His union was apparently no longer able to protect him and he was now only being paid for work he actually did – and work was not as forthcoming. For her part, Ms. Wall had bought some home furnishings when she moved out from Smallwood and had then paid dearly to extract herself from the new lease when Smallwood showed her his final divorce papers. Moreover, she was still making payments on the car she had purchased when hers was stolen just before she took the job with WMATA. There was

no fall back money to cover the arrears.

It was Ms. Wall alone who set upon the plan to commit to fraud on WMATA. In March of 2004, she schemed to obtain $3,000, all of which was used to bring Smallwood's rent to date. She obtained another $3,000 in July, 2004 and then again in September, 2004. Smallwood learned what Wall was doing, but did not participate in the scheme. Once the arrearage was current, the remainder of this money was used to substantially subsidize or replace Smallwood's contribution to the monthly budget. Smallwood did not protest.

One month later, in October, 2004, Mr. Smallwood came outside their apartment to where Ms. Wall was visiting with family members and publicly announced that he was giving her a 30-day notice to leave.  He was apparently upset with the time she was spending with her family. It was a humiliating moment for reasons far more than that she had been risking her career and freedom to subsidize his contribution to the household. But that humiliation triggered a resolve in Ms. Wall that she had not felt in some time. Within days, she borrowed $5,000 from a dubious source she knew from the street and found a house to rent. In that same month – October of 2004 – she converted two more fraudulent checks at WMATA totaling $1,500. Another check – this, now the seventh of nine total – was converted the following month in the amount of $1,500. The last two checks were converted in February and March, 2005, respectively. Almost all of the money from these last five checks – amounting tp $6,000 in all – was used to pay back the street lender. **And then it was over. There would be no more fraud between March, 2005 and when Ms. Wall was confronted by WMATA detectives in June, 2006**.

Mr. Smallwood's subsequent campaign to bring Ms. Smallwood back did not lack for effort. But it did eventually lack for lawfulness as the campaign evolved into harassment. There followed intervention by the police and the Maryland courts. Smallwood was not initially deterred by court

proceedings, however, eventually deciding to file a complaint against Ms. Wall alleging telephone harassment. Ms. Wall was accordingly charged but the charge was eventually dismissed when Smallwood did not appear to testify at her trial (see Paragraph 27, Pre-sentence Report). In time, Smallwood spent four weeks in jail for violating a stay-away order once too many times, which finally seemed to have some effect. But Smallwood he was not without one last gift as he reluctantly let go of Ms. Wall: he went to WMATA to report Ms. Smallwood's thievery. He apparently declined to report the extent to which he had benefitted from the fraud. Although all of this may have been bad form on Smallwood's part, Ms. Wall recalls actually feeling some relief in admitting her fraud once confronted. She would continue her return to integrity begun fifteen months earlier.

## V. Alcohol Abuse

From the above, it is not surprising that there was significant anxiety – both financial and emotional – in Ms. Wall's life from August, 2000 – when she met Smallwood – until June, 2006 when she was confronted by WMATA detectives. Anxiety of a different sort took hold in June, 2006, when she was forced to face the reality of having a felony conviction. While she has since managed to secure another position at Howard – a position that involves no involvement in financial matters whatsoever (a position description has been provided to United States Probation Officer Michael Penders) – and although she is back with her family, with her oldest child now in college and her two other children returned to some semblance of a normal life, she remains emotionally unsettled. Although her once dark depression – and her related thoughts of suicide – have largely lifted, anxiety remains, swinging between manageable and acute depending on the day. She treats her anxiety with alcohol, although she now prefers white wine over the hard liquor she preferred a few years ago. There is no pretense about her circumstance; no denial. She told United States Probation Officer Michael Penders (USPO Penders") at her pre-sentence interview that she feels

strongly that she would benefit from mental health counseling. She also advised that her alcohol abuse was "extremely" serious and believed it "considerably" important that she receive treatment to address it.

## VI. Restitution

Although the amount from the nine fraudulent, WMATA checks totals $15,000, at the time WMATA terminated Ms. Wall it direct-deposited a final check owed her and then immediately seized back that same amount as a partial offset of the stolen funds. It is counsel's understanding that the amount of that deposit/seizure was approximately $900. Counsel is attempting to obtain a record of that transaction. Additionally, undersigned counsel has just recently learned that at the time Ms. Wall was terminated, she had approximately 172 hours in accrued leave, which may have had some - perhaps significant – monetary value. Upon her inquiry following termination, Ms. Wall was advised that she would not be paid the cash value of those hours. Whether the cash value of those hours was also kept as a partial offset for the money stolen, or whether such compensation was discretionary, remains to be determined. Counsel has been attempting to make contact with the WMATA detective reference above, and counsel has spoken with USPO Penders who is also working to resolve these two questions before sentencing. Should a motion to continue sentencing following the submission of this memorandum be deemed necessary in order to resolve these two issues, such a motion will be timely made.

## VII. Sentencing Recommendation

This memorandum is submitted in the hope that this Court will be convinced that a probationary sentence would be the one deemed here as "sufficient but not greater than necessary" to achieve the statutory purposes of sentencing. *18 U.S.C. §3553; United States v. Booker*, 125 S.Ct. 738 (2005). It is respectfully submitted that such a sentence would be just punishment and promote

respect for the law while reasonably assuring that the public need not be protected from further crimes by the defendant. Moreover, the choices Ms. Wall has made since even before she was confronted with her crime would suggest that the goals of deterrence and rehabilitation are already in the process of being met. In sum, it is respectfully submitted that a probationary sentence would achieve the purposes of punishment, thereby satisfying each of the Court's sentencing concerns under *18 U.S.C. §3553*.

        Respectfully submitted,

        JOSEPH BESHOURI
        419 - 7th Street, N.W.
        Suite 201
        Washington, D.C. 20004

        Counsel for Lisa Wall